MICHAEL P. GAMACHE, PH.D.
FORENSIC PSYCHOLOGY, NEUROPSYCHOLOGY, PSYCHOLOGICAL ASSESSMENT & TESTING
3903 NORTHDALE BLVD., SUITE 100E
TAMPA, FL 33624
PHONE: (813) 264-9600
DRMGAMACHE@ICLOUD.COM

**CONFIDENTIAL**

**REPORT OF PSYCHOSEXUAL RISK ASSESSMENT**

**ATTORNEY-CONSULTATION WORK PRODUCT[1]**

December 31, 2020

Mark Rankin, Esquire
Rankin Law
805 W. Azeele Street
Tampa, FL 33606
mark@rankinlawoffice.com

**Re:    United States v. Christopher Streeter**
       **Case #: 8:20-cr-304-T-33CPT**
       **United States District Court, Middle District of Florida**

Dear Mr. Rankin,

Thank you for the opportunity to consult with you regarding the case of Christopher Streeter. I conducted a forensic psychosexual evaluation of this case in accordance with an agreement to provide confidential consultation to you regarding psychological factors potentially relevant to Mr. Streeter's defense. In this sense it should be considered a consultation relevant to preparation for trial, sentencing or development of legal theories, opinions, and strategies.

Should you release this report as a part of discovery or otherwise, it may be helpful for the reader to have some knowledge of my professional experience as it relates to this type of case. I have a Ph.D. in Clinical Psychology, a residency in Clinical

---

[1] The work-product privilege or doctrine originated in the seminal case of Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385 (1947), in which the U.S. Supreme Court held that statements of witnesses obtained by an attorney prior to trial were privileged and thus protected from discovery. The Court reasoned that to allow otherwise would be contrary to the public policy underlying the orderly and just prosecution and defense of claims. Florida's courts subsequently adopted the work product privilege and it eventually became incorporated into the Florida rules of civil and criminal procedure. When applying the work-product privilege, courts generally use the same principles in both civil and criminal cases…The primary policy objective of the work-product doctrine is to preserve the effective assistance of attorneys and others employed to help prepare a case for trial. Maintaining the privacy of communications between client, attorney, and others employed in preparing for litigation — especially privacy in the development of legal theories, opinions, and strategies-the doctrine fosters the effectiveness of legal assistance upon which our adversarial system of justice depends. https://www.floridabar.org/the-florida-bar-journal/the-work-product-privilege-in-a-nutshell/

- Page 2                                                          December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

---

Neuropsychology and am licensed to practice psychology in Florida by the Florida Department of Health. I first began to evaluate and treat convicted sex offenders at the Missouri State Penitentiary in 1980. I have 40 years of experience in research, evaluation and treatment of criminal sexual deviancy. I have been a principal investigator or co-investigator on both state and federal grants to study sexual deviancy, lust murder and sexual violence. I have served in the capacity of consultant regarding issues of sexual crime to the office of the Governor of Florida, the Florida Department of Children and Families, the Florida Department of Law Enforcement and the Florida Department of Corrections. I routinely conduct evaluations of accused or convicted sexual offenders and suspected Sexually Violent Predators by order of the court, retention by defense counsel and retention by prosecutors. I have conducted thousands of evaluations over the course of 40 years, including both research and clinical evaluations. I have been qualified to offer expert testimony in such matters in state and federal criminal courts and in military tribunals. It is based on this 40 years of experience that I conducted an evaluation of the case of United States v. Christopher Streeter and offer the opinions contained herein.

This report should be considered a summary of my findings and opinions and does not constitute the entirety of all of the information reviewed or considered. It is subject to revision should new or additional information be developed.

**Procedures**

- Review of records
- Informed consent
- Psychological testing
- Psychosocial history
- Psychosexual history
- Mental status examination
- Clinical interview (4.0 hours 12/30/20)
- Actuarial assessment of risk
- Clinical assessment of risk

Pursuant to your request for consultation, I completed a confidential, forensic psychosexual evaluation of Mr. Streeter. The evaluation was conducted with the explicit understanding that the findings and opinions would be objective and that I would not act in the capacity of an advocate for Mr. Streeter.

In preparation for examination I reviewed the records you provided, which are itemized below:

1. Presentence Investigation report

- Page 3
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

December 31, 2020

---

2. Plea Agreement
3. Information

**Informed Consent**

At the beginning of the examination I advised Mr. Streeter regarding the limits of confidentiality. I informed him of statutory exceptions to confidentiality and also informed him of the procedural exceptions that you and he exercise control over with regard to discovery. He consented to participate in the examination and for me to provide information to you, including this written report summarizing my findings. I emphasized the importance of being open and honest in responding to examination and the risks associated with any dissimulation. Mr. Streeter was explicitly informed that I would rely on his self-report as truthful and that in the event it was not, and the government had contradictory information, it could adversely affect the validity of any of the findings contained in this report.

**Pertinent History**

During examination, I obtained a detailed psychosocial and psychosexual history. This is largely based on the verbal or written self-report of the defendant. Where possible, when provided supporting documentation (i.e., Presentence Investigation Report, 12/3/20), the self-report is assessed for consistency with documentation. I will be happy to share details with you as necessary, but I will summarize the psychosocial history details most pertinent to the current assessment as follows:

1. <u>Family & Development</u>: The defendant denied that there was anything about his family and developmental history that was contributory to the instant offenses. Christopher Streeter is a 63 year old, male. He was born in Christchurch, New Zealand on June 11, 1957. He is a US citizen. He was born full-term and free of complications. He was not exposed in utero to drugs or alcohol. He was generally healthy as a child and adolescent. He was raised primarily in a single parent home by his mother. He characterizes himself as generally unhappy as a child; attributing this to coming from a *"broken home."* There is no significant family history of substance abuse or mental illness. He denies any history of physical, sexual or emotional abuse. In the course of discussing his childhood, Mr. Streeter revealed an affinity for tending to the helpless. By his account this developed after his mother and father divorced when he was age 6. At some point thereafter he remembers rescuing and raising a motherless lamb. This became a special interest of his and he subsequently took in and helped raise several other motherless lambs. In discussing the current case, Mr. Streeter reflected on these early experiences and drew a parallel between them and his sense that he was helping young women by paying for things they needed, such as college tuition, when he paid for pictures or videos. He believes that his sense

- Page 4                                                                December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

---

of satisfaction in helping *"hardship"* cases was something that caused him to have particular difficulty in resisting or withdrawing from this activity despite realization of illegality and a sense of guilt.

2. <u>Education</u>: The defendant denied that there was anything about his educational history that was contributory to the instant offenses. Mr. Streeter graduated high school, attended college and earned a Bachelor's degree.   His conduct in educational settings was good. He was never suspended or expelled. He was not considered a bully, but reports that he was the victim of some bullying in the school setting. He was never in trouble for any type of sexual misconduct in an academic setting.

3. <u>Employment and Financial</u>: The defendant denied that there was anything about his employment and financial history that was contributory to the instant offenses. Mr. Streeter has generally maintained stable employment and has not relied on others for financial support. He has been self-employed for the last 20 years. He reports no history of financial irresponsibility. He has never had serious financial problems, has never filed for bankruptcy, and has never had any foreclosures or repossessions. He has never been accused of sexual harassment or sexual misconduct in the employment setting.

4. <u>Living Situation & Relationship History</u>: The defendant acknowledged that there may be things about his living situation and relationship history that were contributory to the instant offenses. He admits to being generally dissatisfied by his relationship history, though he reports the current marriage as an exception. Mr. Streeter is presently married. He and his wife have been married for 4.5 years and have one child together. Mr. Streeter explains that he met his wife during a vacation to the Philippines. He describes it as a chance encounter at a mall. They exchanged online information and their courtship continued through online conversations until she emigrated to the US and they married in April 2016. This marriage is Mr. Streeter's 7th marriage. He has been married to five women previously, with one of them ending in divorce and then remarriage. There is a significant age difference in the current marriage. Mr. Streeter is 63 and his wife is 29. This is the only wife he has had involving a significant age gap. In all other instances there was no more than an 11 year age gap, and in that case it was his wife who was 11 years older than him. Mr. Streeter reports a total of three children. He has a 34 year old son born during his second marriage. He has a 16 year old daughter with his last ex-wife. He has a 3 year old son with his current wife. Of particular case significance by Mr. Streeter's account is his last previous marriage. Mr. Streeter indicates that he was essentially duped into marriage by his ex-wife; who he says was mentally ill and manipulative. He was in the process of terminating the relationship with her when she became pregnant. Thereafter they experienced continuing conflict, she was

- Page 5                                                         December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

---

unfaithful, and he ultimately was awarded custody of his daughter and raised her by himself for many years. This was significant to Mr. Streeter because it was during this time frame that he says he came to be involved in and dependent on the online sexual activities that ultimately evolved and led to his arrest in the instant case. Mr. Streeter says that he is not accused or suspected of ever molesting any of his children. He says that his ex-wife filed many false complaints against him in an effort to regain custody, but they were all considered unfounded. He believes that his daughter has been interviewed and has reported no history of physical, sexual or emotional abuse and that they enjoy a good relationship.

5. Criminal History: Mr. Streeter reports no criminal history as either a juvenile or adult. The PSI is consistent with his self-report. He has a valid driver's license and no history of recurrent traffic violations. He has a history of respect for law enforcement and the criminal justice system. He is generally motivated to refrain from criminal behavior by moral beliefs and fear of consequences. His conduct in this case does not appear to be due to general criminality.

6. Psychological History: Mr. Streeter does not have a history of diagnosis or treatment for mental illness. He does not believe he has ever suffered from a diagnosable mental illness, but he does believe that his mental state at the time that he first became involved in the online activity that eventually led to the instant case was in part the product of sustained duress; specifically the impact to his social and sexual life of being a single parent to a young child for many years, while simultaneously fighting repetitive false allegations from his ex-wife.

7. Substance Use: Mr. Streeter does not believe substance use was a factor in the instant offense. He does not use and has not ever used illicit drugs. He drinks alcohol and began drinking at the age of fifteen. He estimates an average consumption of 6 to 8 beers per week. He does not attribute any of the behavior associated with the instant case to being under the influence of alcohol.

8. Medical History: The defendant does not believe that his medical history is contributory. He is currently under medical care, and is scheduled for hernia surgery in the next month. He is otherwise in adequate health and reports medication only for osteoarthritis of the knees. He has no history of brain damage or neurological disease that might adversely affect inhibitory control. He has no history of stroke or dementia.

- Page 6                                                           December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

---

## Investigative Facts and Discovery

Case #: 8:20-cr-304-T-33CPT; United States District Court, Middle District of Florida

Mr. Streeter is charged by Information with one count of Sex Trafficking of a Minor in violation of 18 USC § § 1591(a) and (b)(1) and 2:

*§1591. Sex trafficking of children or by force, fraud, or coercion*
*(a) Whoever knowingly-*
*(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or*
*(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),*
*knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e) (2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).*
*(b) The punishment for an offense under subsection (a) is-*
*(1) if the offense was effected by means of force, threats of force, fraud, or coercion described in subsection (e)(2), or by any combination of such means, or if the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had not attained the age of 14 years at the time of such offense, by a fine under this title and imprisonment for any term of years not less than 15 or for life; or*
*(2) if the offense was not so effected, and the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had attained the age of 14 years but had not attained the age of 18 years at the time of such offense, by a fine under this title and imprisonment for not less than 10 years or for life.*
*(c) In a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited, the Government need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years.*
*(d) Whoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be fined under this title, imprisoned for a term not to exceed 25 years, or both.*
*(e) In this section:*
*(1) The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.*
*(2) The term "coercion" means-*
*(A) threats of serious harm to or physical restraint against any person;*
*(B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or*
*(C) the abuse or threatened abuse of law or the legal process.*
*(3) The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.*

- Page 7
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

December 31, 2020

---

*(4) The term "participation in a venture" means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1).*
*(5) The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.*
*(6) The term "venture" means any group of two or more individuals associated in fact, whether or not a legal entity.*

Specifically, Mr. Streeter is accused of communicating with *"recruiters"* in the Philippines to solicit sexually explicit videos of a minor under the age of 14. The facts of the case are summarized in the Plea Agreement. Mr. Streeter is accused of participating in a *"scheme to sexually exploit children in the Philippines for the purpose of producing child sex abuse images and videos for his consumption and sexual gratification"* between September 2018 and June 2019. He is alleged to have communicated via the internet generally, and FaceBook specifically, *"with several identified and unidentified minors and adults in the Philippines."* Mr. Streeter's communications are reported to have involved both adult and minor *"recruiters"* who he paid to obtain sexually explicit videos. He is specifically described as paying a *"premium"* for images involving minors losing their virginity or being inseminated.

Although the discovery suggests that Mr. Streeter's illegal activity in this regard was prolific, he was ultimately charged with only one count of sex trafficking related to a 12 year old female victim identified as *"Victim-1"*. Specifically, a *"recruiter"* identified as L.A. informed Mr. Streeter of a *"new girl"* under the age of 18. L.A. sent Streeter pictures of Victim-1 and offered to produce a video of Victim-1 for Streeter in January 2019. L.A. repeated this offer in March 2019, identifying Victim-1 as a *"virgin girl,"* to which Mr. Streeter allegedly responded by requesting more pictures.

In April 2019, Mr. Streeter is alleged to have inquired about how much it would cost to *"get the video,"* and was quoted a price of 2000 pesos. Mr. Streeter wired the money to L.A., and several hours later L.A. sent Streeter two sexually explicit videos alleged to be of Victim-1. In June 2019, Streeter and L.A. spoke again about Victim-1 and complained that the two videos sent in April were poor quality. He again wired money, 4500 pesos, and was told that Victim-1 was ready and waiting to make another video.

The plea agreement does not specify whether a video was in fact sent in response to this payment, but indicates that several days later there was again discussion between Streeter and L.A. regarding another video involving Victim-1. Subsequently, Mr. Streeter wired 4016 pesos. Two days after this wire transfer, Mr. Streeter sent an additional 3250 pesos to L.A. and two days later she sent him two additional videos of Victim-1.

- Page 8                                                December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

---

**Defendant's Account of Instant Offense**

Mr. Streeter is aware of the allegations against him. He confirms that he has entered into a plea agreement based on the belief that the government can likely factually prove the one count against him. Mr. Streeter is motivated to resolve his case. He agreed to answer my questions about history, motive, thinking, reasoning and emotions that contributed to his involvement in this matter. The following is a brief summary of the events Mr. Streeter related to me.

In tracing the course of his involvement in the instant offense, Mr. Streeter opined that the onset of events that led to his conduct was around 2005. Mr. Streeter explained that in 2002 he had met a woman from Peru. The relationship he formed with this woman was troubled. He says that he learned after he had become involved with her that she had three children in Peru and that she was unfaithful. He tried unsuccessfully to break off the relationship, yielding to her request that he not do so until after her parents visited for the holidays. During this time frame Mr. Streeter describes developing a hernia problem and being treated and medicated in Ft. Lauderdale before returning to Tampa. It was sometime shortly after this when his girlfriend told him that she was pregnant. He believed that she had been impregnated by her ex-boyfriend, who he had learned she was still seeing behind his back. She insisted the child was his and that she had engaged him in sex while he was in an altered state of consciousness due to narcotic analgesics from his surgery. As a result, he reluctantly continued the relationship and married her because he did not want to abandon his child. Mr. Streeter explains that the relationship did not go well at all, his wife had episodes of severe psychological decompensation, she was mentally and physically abusive to him, and neglectful of their daughter and her three children who had come from Peru. This eventually led to him calling DCF from Ft. Lauderdale when he learned that she was *"drugged out"* and left the care of their infant daughter to her three older children.

After much tumult and conflict, Mr. Streeter says that he left Tampa with his two month old daughter after DCF threatened to put her in foster care due to his wife's neglect. Sometime thereafter he had primary custody of his daughter and says that he raised her as essentially a single parent for many years. This, he explains, led to a dramatic change in his lifestyle and led to his involvement in online activities, and ultimately to the instant offense.

Beginning in 2005, Mr. Streeter says that all of his time was spent working and looking after his daughter as a single parent. DCF sheltered her with him as they worked toward a time sharing plan. Mr. Streeter describes being a devoted parent who wanted the best for his daughter and consequently he largely halted all of his social activities — including any dating and courtship activities — to care for his daughter. It was during this time frame that he recalls a friend of his telling him about

- Page 9                                                December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

---

an internet website called Asiankisses.[2] Mr. Streeter explained, *"Back then there was no facebook, no messenger. I started communicating with some girls on this website. They are all legal age, nineteen, twenty, twenty-five. It became the only entertainment I had. The internet became my source of socialization. I couldn't go out with my daughter. I didn't want to leave her with anyone else."*

I asked him about the origin of his attraction to Filipino females. He said, *"A friend of mine had a Filipino wife and she was the most beautiful woman I had ever seen… they are so devoted. Divorce isn't even in their vocabulary. They are calm, they don't get excited, start yelling and screaming. They don't throw things. I wanted a woman that was quiet, relaxed. Filipino girls were known to have those qualities, plus they were incredible mothers. That appealed to me. I had a little girl."*

Mr. Streeter says that his activity on this site was a pleasant and stimulating distraction and it led him to similar sites that involved communicating with girls at *"internet cafes."* He explains that this eventually led to sexually provocative activities:

*"I started talking with these girls. There was another web site you could use. There was a website at cafes you could see them on video chat. They would say I don't have money for the internet cafe, so if you wanted to talk with them you had to give them money. So I just started sending money to the girls, the more girls the more money. They wanted to chat, but they were online to make money. They send you a few pictures of them in some sexy clothes. You want to see more. They are sending you naked pics and you send them money. After a while they said why don't you send me money for a private cafe and I'll take my boyfriend there and you will see a live show. This was big business over there. That's where I ventured into the entertainment value of the video pornography sitting there talking to a girl that I would probably never see. That went on for several years. It was not every single day. The girls were all legal age. Everything was above board. It gave me the socializing I could do while taking care of my daughter."*

---

[2] https://www.asiankisses.de - *accessed 12/30/2020*
*"The International Asian Dating Website"*
*"Every year, thousands of people from all over the world find love on Asiankisses.de. Asian Kisses has been helping match asian girls to both asian guys and international guys since it's inaugural launch in 2006, and now serves hundreds of thousands of singles from various countries. With the assistance Asiankisses.de, thousands of single men are able to meet, flirt and date with some of the most exotic girls in the world. Asian Kisses is the number one asian dating site for those looking to meet beautiful asian girls online.*
*AsianKisses.de are serious about finding you the perfect guy, or asian girl. Through AsianKisses, you can search, message and chat with hundreds of asian girls and guys; meeting that special asian girl and forming a lasting relationship is as easy as clicking on any one of the photos and singles ads available online. AsianKisses can help you find the date or relationship that fits you best, whether it be for fun, friendship or marriage, confident you will find the right partner for, or have fun trying. So what are you waiting for? Sign up FREE today!"*

- Page 10                                                    December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

---

*"After 2006 we began to exchange (time-sharing) and she would live with her mother a week then me for a week. So when she was not around I didn't have much interest in socializing any more. (I always kept the door shut so she would never see it). I found myself not wanting to go out when my daughter was with her mother. I was just too tired, the work and the endless litigation. She was a pro se litigant and every week there was something new she would file. I had attorneys and some of them after six months they were like 'I can't deal with it I'm out.' False domestic violence injunctions, false complaints. she would claim I was hurting our daughter. DCF would investigate, it's a diaper rash case closed. We weren't even living together and she is filing domestic violence injunctions. Every one was dismissed as baseless. All this takes a toll. I had nothing to talk about with a woman because my whole life was embroiled in taking care of my daughter and dealing with all my wife's crap. Five weeks I didn't see my daughter, the judge did nothing."*

*"My downward spiral started with all this litigation and the loneliness and I remember just despair and depression. Sitting on my bed, when will I see my daughter again. The money I was spending on attorneys was ridiculous, thousands of dollars per month. Normal women don't want to be involved with a guy dealing with all this stuff. My whole life was work and litigation and taking care of my daughter. So I became dependent on social media, the girls in the Philippines, to provide me with any socializing I was getting. I knew it wasn't healthy but I felt powerless to stop it. In 2009 I had to move to Tampa, away from my job, my friends, my support network because the court said my daughter had to go to school in Hillsborough County. So I moved to Dade City because she was teaching at a school there. I never felt so lonely, so helpless. Every other week with my daughter, but this place was foreign to me. It was like being in another country. I had no job. I was living on my savings. So that pushed me into spending more time on line. I couldn't go out anywhere in Dade City, so different than what I was used to. So again I went to my computer for release and to get whatever socializing I could out of that. That was 2009. 2010 I started a job selling cars. I went from captain of a multimillion dollar yacht to selling cars. Patriot Chevy. Worked there about a year. The money became my biggest enemy. I ended up selling a boat. I got $39,000 in commission for selling it. Now I was flush with cash and I could send money to the girls in the Philippines and not worry about it."*

*"Some time in 2014 or 2015, even though my life was somewhat back on track, I had become addicted to shall we say to this social media platform with messenger. And the girls, the new girls had shown up. The girls I talked to before had faded off, moved on. A new breed of girl had come on line had come of age with the smart phones and now these girls were around in the earlier years, but they were not on my radar. With the new social networking and smart phones this whole new set of girls started showing up making videos and not necessarily illegal. They were doing it, but it had not come onto my radar. They were making videos at a frantic pace for*

- Page 11                                                         December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

---

*many, many customers. I'm sure they had illegal ones, but they didn't offer them to me at that time."*

*"They eventually said they had some nice young girls. I assumed they were 18 or 19. One they sent me was a beautiful young girl. I assumed she was 18. They said she wanted to make another video and they told me then she was 16. I thought they were lying to me. She looked 18. The pressure started. I still had not recovered from all the years of being alone. I still had demons bothering me. Still litigation, relatively alone. First person I started dating was my wife online in 2015, by that time these other girls had entered into my line of site and pressure started. They were not telling you that the girls were underage. They were hoping you didn't ask. They would be like this girl is in college and she needs help with her tuition. It was endless, relentless, five or six people a day pounding me constantly, why won't you help this girl out she needs your help. In my mental state at that time I was not strong enough to say no…No I'm not doing this it is going down the wrong road. That old feeling came back, I can help this girl. I had plenty of money. I had nobody there that I could talk to or say am I doing something wrong. In my head I was convinced I was helping these girls. Thats when it started down the path there was no return from. When you cross that line sometimes you don't know, it is blurry. I wasn't looking for the line. I assumed in the beginning the girls were telling the truth. That's how I ended up in the position I'm in."*

*"Somebody sent me a video they should not have sent me. I tried to find ways to rationalize it, but I knew I had crossed the line and I didn't know how I was going to get back. The feeling came back that it was a good thing I was doing. I was helping them. They had me convinced that I was genuinely helping these girls and this is how they wanted to show their gratitude. My mind was not functioning properly at the time to question their motives."*

When asked how he knew he had crossed the line with that one video he said, *"Well it started in 2018, one girl who was a prolific producer of these videos was trying to convince me to have this girl make a video. At the time I was not interested because I felt like they were lying to me about the age of the girl. It had become such a part of my life it was like trying to quit smoking after you have smoked for ten years. She kept hounding me. It took maybe six months before I caved and I sent her money and she sent me the video. I didn't know, or I didn't recall her telling me the girl was 13 years old. I had heard of this girl from other people and I had never purchased anything of this girl. It was not until I was pissed at her after she sent me the video. I thought the girl was at least 16. The video was very poor quality. That's when she said she is shy she is only 13. I was numb at that point, but angry at the person that sent me the video."*

- Page 12                                                    December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

---

*"I asked myself many times was I responsible for this girl making the video. I never would have wanted a girl that young to make a video. I don't think my level of morals, well my level of morals had certainly taken a nose dive over the years of how I found my release, but I don't think it had stooped so low that I would have accepted that video if I had known she was only 13 before the video was sent. I sent a lot of money to the girls. A lot of times never got anything back in return. I don't really know how many videos I received that were girls under age. They were mixed in with so many that were girls of age that could have passed for underage. That video I knew I had crossed the line and I didn't know what to do about that. I had received maybe three other videos after that. The government claimed a girl was 14, but I knew who she was. But they didn't charge me on that. Most of it is based on that one video from my understanding."*

When asked why he did not cease these illicit activities after his current wife emigrated from the Philippines and they married in 2016, he said, *"Yes this was going while I was married to her…it was like that reference to smoking for 12 years and trying to stop. I don't know it was so much of an addiction, more a dependency. Even though I had a great sex life with my beautiful wife, the constant hounding of the girls I think I just couldn't get out because they wouldn't let me out and I don't think I was strong enough. I hadn't recovered; my moral clock had not reset itself."*

Mr. Streeter is adamant that as an adult he has never had sex with a minor and insists that even if he had the opportunity to act on sexual interest in a child he would not do so. He says he never considered doing so or had such inclination. Mr. Streeter is confident that a full forensic analysis of his electronic devices would not reveal any activity that represented an attempt to solicit or pursue actual hands-on contact with a child.

**Psychosexual History and Adjustment**

Mr. Streeter has a relatively conventional sexual history for his age and cultural background; though not a typical relationship history. He became sexually active with female peers around the age of 15 or 16. In his lifetime he estimates a total of approximately 25 sexual partners, including his current wife and his five ex-wives. He describes nearly all of his sexual relationships occurring in the context of longer term dating relationships, with little history of casual sex or sexual promiscuity.

Mr. Streeter admits that his relationship history has been less successful and stable than he would have desired, and he attributes this in part to his tendency to choose partners who were needy or had some problem that he thought he could change. He said, *"I seem to always be attracted to hardship cases that were not good to me in any shape or form. It was like I can fix her and I couldn't. I was naive to think that."*

- Page 13                                                    December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

---

When asked to explain the origin of his attraction to *"hardship cases,"* Mr. Streeter said, *"My parents divorced when I was six or seven. At that time for some reason I found a lamb. It's mother had died from a bad frost in winter. This thing was wandering around the field. I got it and brought it inside. I raised him. Within six or seven months, I had six or seven of these motherless lambs in my backyard. From then on I was attracted to the hardship cases. I was raised Catholic. Mother devout Catholic. Uncle that was a priest. Aunt who was a nun. At seventeen, my uncle convinced me to join the monastery to be like him. I had a girlfriend at the time and I didn't want any part of that. The influence of my uncle and his sacrifice were very prominent in my life. He spent a winter in Antarctica and he spent time working for the pope in Rome. I admired him. I admired the sacrifices he made. He was just so human. He gave of himself constantly. I tried to emulate him in some ways, but I didn't have the faith that he had. I got burned several times trying to do the right thing and help somebody. I always got a lot of satisfaction from helping someone. It wasn't necessarily my life's work, but as people crossed my path, everybody has problems and it just seemed like people with the worst problems were the ones crossing my path. Women primarily. I was more attracted to the frailty of women in jeopardy or women in general I guess."*

Mr. Streeter does not admit to any history of unusually high sexual drive, promiscuity, sexual fetishes or unusual reliance on masturbation; though masturbation was his exclusive means of sexual gratification from 2005 to 2016. He does not admit to any involvement in other sources of child pornography or child erotica. Aside from the activity and exchange of money he described in relation to the online activity, he denies otherwise trading money for sex or the use of prostitutes. Although he described taking a trip to the Philippines in 2013, he denied that it involved sexual tourism. He says that he did not advise any of his online contacts in the Philippines that he was coming, did not talk to them while he was there, and did not engage in any sexual activity during the trip. He did, however, meet his current wife while there. He says that at the time she was a college student in nursing school and they literally bumped into each other at the mall. They exchanged online contact information and continued to communicate regularly after he returned to the United States.

Mr. Streeter is confident that the government can not point to any other evidence of sexual aberration because this was his only illicit activity. He denies ever being accused of any type of sexual misconduct or being a suspect in any sexual crimes against children. He denies any sexual interest in his daughter or other female minors he has been around. He denies engaging in activities, vocational or otherwise, that would bring him into regular contact/proximity to children for purposes of grooming them or engaging them in sexual activity. He admits that he had some unsupervised contact with other female minors who were friends of his daughter, that he sometimes hosted sleepovers for his daughter and her friends, and

- Page 14                                                December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

that he attended his daughter's sporting events, but did not otherwise seek out opportunities to be around children.

**Psychological Test Results and Clinical Impression**

Psychological testing was conducted to determine two primary issues: a) Whether the defendant suffers from any underlying psychological disorder that might be relevant to future risk and that might help to explain the current case, and b) Whether the defendant displays characteristics of antisocial or psychopathic personality that elevates risk. The test used for this purpose was the Personality Assessment Inventory (PAI).[3] Test responses were compared with the following normative samples:    1) Normal controls, psychologically healthy subjects, 2) Subjects with confirmed psychological disorders, 3) Correctional subjects.

The PAI is one of the most widely used and generally accepted measures of psychological adjustment. It includes 22 non-overlapping scales covering the constructs most relevant to a broad-based assessment of mental disorders: 4 validity scales, 11 clinical scales, 5 treatment scales, and 2 interpersonal scales. Clinical scales provide critical diagnostic features of 11 important clinical constructs. These 11 scales may be divided into three broad classes of disorders: those within the neurotic spectrum, those within the psychotic spectrum, and those associated with behavior disorder or impulse control problems. The PAI is the subject of over 250 peer reviewed scientific publications, including studies specific to criminal justice/correctional populations.[4]

Mr. Streeter produced a valid profile. There was no evidence that he answered questions in an attempt to appear overly virtuous (positive impression management) or in an attempt to mitigate his sentence by appearing mentally ill (negative impression management/malingering).

The clinical profile is entirely within normal limits and generally consistent with Mr. Streeter's self-report of positive psychological adjustment aside from situational circumstances. The PAI clinical profile reveals no marked elevations that would be considered to indicate the presence of clinical psychopathology.   According to Mr. Streeter's responses, he describes no significant problems in the following areas: unusual thoughts or peculiar experiences; antisocial behavior; problems with empathy; undue suspiciousness or hostility; extreme moodiness and impulsivity; unusually elevated mood or heightened activity; marked anxiety; problematic

---

[3] Morey, L. C. (1991). The Personality Assessment Inventory professional manual. Odessa, FL: Psychological Assessment Resources.

[4]  Morey, L. C., & Quigley, B. D. (2002). The use of the Personality Assessment Inventory (PAI) in assessing offenders. International Journal of Offender Therapy and Comparative Criminology, 46, 333-349.

- Page 15                                                    December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

---

behaviors used to manage anxiety; difficulties with health or physical functioning; significant problems with alcohol or drug abuse or dependence.

There was no evidence from testing of any psychopathic or antisocial tendencies. Consistent with his behavioral history, he scored well below the average criminal justice subject on measures of antisocial behavior, egocentricity, and sensation seeking (-0.024 coefficient of fit with convicted felons). His basic clinical profile is illustrated at the end of this report.

**Assessment Conclusions**

<u>Pathology</u>

A central issue in cases of this nature is whether the defendant's actions were the result of a paraphilic disorder. A paraphilic disorder is considered a diagnosable clinical condition that involves a pattern of deviant sexual thoughts, fantasies or behaviors that when acted upon cause distress or dysfunction for the individual. This is sometimes distinguished from paraphilia without disorder or from deviant or marginal sexual interests that do not result in impairment or dysfunction.[5]

Mr. Streeter denies being sexually attracted to minors, but admits to a sexual preference for petite females and in particular Filipino females. Part of his attraction to Filipino females is based on their youthful physical features. Some of the online communications revealed in discovery further indicate potential fetishes related to insemination and virginity. Mr. Streeter acknowledges knowing that his activities in the instant case were illegal and experiencing a recurring sense of guilt and regret for such activities. This suggests some evidence of personal distress related to deviant interest and not merely fear of societal disapproval. Diagnostically, his history and clinical presentation suggests a differential diagnosis of Fetishistic Disorder versus Pedophilic Disorder. Pedophilic disorder appears less likely in this

---

[5]American Psychiatric Association, Diagnostic and Statistical Manual - 5
Characteristics of Paraphilic Disorders
Most people with atypical sexual interests do not have a mental disorder. To be diagnosed with a paraphilic disorder, DSM-5 requires that people with these interests:
• feel personal distress about their interest, not merely distress resulting from society's disapproval;
or
• have a sexual desire or behavior that involves another person's psychological distress, injury, or
death, or a desire for sexual behaviors involving unwilling persons or persons unable to give legal consent.
To further define the line between an atypical sexual interest and disorder, the Work Group revised the names of these disorders to differentiate between the behavior itself and the disorder stemming from that behavior (i.e., Sexual Masochism in DSM-IV will be titled Sexual Masochism Disorder in DSM-5).
It is a subtle but crucial difference that makes it possible for an individual to engage in consensual atypical sexual behavior without inappropriately being labeled with a mental disorder. With this revision, DSM-5 clearly distinguishes between atypical sexual interests and mental disorders involving these desires or behaviors.

- Page 16                                                    December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

---

case, even though the identified victim for count one may have been only 12 or 13 at the time of the offense. Mr. Streeter's self-report does not suggest that his arousal is primarily to prepubescent girls. Instead, he has a strong attraction to slender, petite females of all ages (e.g., his current wife is 29 and is 4'11" and 100 lbs; the mother of his daughter was 5'0" and 80 lbs). He would meet the diagnostic criteria for Fetishistic Disorder (DSM-5; 302.81) as follows:

A. Over a period of at least 6 months, recurrent and intense sexual arousal from either the use of nonliving objects or a highly specific focus on nongenital body part(s), as manifested by fantasies, urges, or behaviors - In Mr. Streeter's case the focus of his sexual interest was real or feigned defloration and/or insemination of slender, petite, Asian females, with gradually diminishing regard for legal age.

B. The fantasies, sexual urges, or behaviors cause clinically significant distress or impairment in social, occupational, or other important areas of functioning - Mr. Streeter's behaviors were experienced as psychologically distressing and guilt provoking to him before his arrest. He continued to engage in these behaviors despite getting married in 2016 and having the ability to get his sexual needs met through normal, appropriate, legal sexual activity with his wife; and despite the risk that his wife and family would find out.

Risk Assessment

Clinical Risk Assessment

Mr. Streeter has entered into a plea agreement in this case because he believes the government could likely prove the factual basis for the charge against him. His plea to a sexually motivated crime justifies comparison with other sex offenders as a means to evaluate his risk and danger to the community and whether he is potentially suitable for community management and supervision. Risk assessment can be based on structured clinical assessment and actuarial assessment of risk. Both such risk assessment strategies were employed in this case.

From a clinical perspective the most important risk factors are sexual deviancy and antisocial personality.  In evaluating the magnitude of sexual deviancy I am looking for evidence that the charged criminal activity was just the surface detection of a wider range of deviant acts involving children. Although the discovery makes reference to other possible minor victims that Mr. Streeter may have solicited, directly or indirectly, there is no indication that his deviant sexual interest extended beyond his use of the internet to solicit and pay for sexually explicit images/videos. Thus, based on currently available evidence, and Mr. Streeter's self-report, this appears to be relatively circumscribed deviant interest.

- Page 17                                                        December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

---

Clinically, the most dangerous combination involves a strong deviant sexual interest in the context of antisocial or psychopathic personality characteristics. This is particularly high risk because sex offenders with antisocial characteristics are generally impaired in their ability to empathize with potential victims and less likely deterred by potential consequences. High risk sex offenders typically have a history of exploiting others across multiple settings and circumstances, disrespect for the law, and diverse criminal activity. Psychological testing, clinical interview and behavioral history are all consistent in supporting the opinion that Mr. Streeter does not have strong antisocial characteristics. If Mr. Streeter has not in fact engaged in any attempt at hands on contact with a minor, then this in conjunction with the absence of psychopathic personality characteristics would support the conclusion that he does **not** fall in the *"high risk"* range for sexual recidivism.   The clinical findings are consistent with **low risk**.

Actuarial Risk Assessment

A second approach to risk assessment in sex offenders is actuarial assessment. Actuarial assessment of risk is a way of making a statistical comparison between the defendant and convicted sex offenders who have been followed in the community for five to fifteen years or beyond, and whose post-conviction recidivism is known and documented. One approach to actuarial assessment is a more general approach where all types of sex offenders are lumped together without regard to the type of offense. The instrument used in making such an assessment in this case, the Static 99-R,[6] is generally accepted in the field and is based on large samples of sex offenders (n greater than 30,000). The Static 99-R normative database is substantial and is based on the detected rate of re-conviction for sex offenses or violent offenses for five to fifteen years or longer after convicted sex offenders return to the community. Most of the individuals in normative samples were convicted of hands-on offenses, but a proportion, most likely commensurate with natural sample distributions, were child porn offenders.

The Static 99-R consists of 10 factors that are statistically associated with sexual recidivism. Assessment using this model reveals that Mr. Streeter would fall nominally in the *"Below Average Risk"* classification. He does not have most of the general criminogenic risk factors that elevate risk. The findings that do elevate risk are specific to the allegations in this case and include the fact that the victim was unrelated to him and was a stranger to him. Scored liberally he would also be at some increased risk due to the fact that he did not have actual physical contact with

---

[6] Hanson, Babchishin, Helmus, & Thornton. (2013). Quantifying the relative risk of sex offenders: Risk ratios for Static-99R. Sexual Abuse: A Journal of Research and Treatment, 25(5), 482-515.
Helmus, Hanson, Thornton, Babchishin, & Harris. (2012). Absolute recidivism rates predicted by Static-99R and Static-2002R sex offender risk assessment tools vary across samples: A meta-analysis. Criminal Justice and Behavior.

- Page 18                                                                    December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

---

the victim (non-contact sexual offenses generally have a higher rate of recidivism), though the facts of this case suggest the virtual equivalent of a contact offense. The major risk mitigating factor is Mr. Streeter's current age. Sex offenders released to the community in their 60's are, as a generalization, at much lower risk to reoffend.

Scores on the Static 99-R can range from -3 to +12. Mr. Streeter scores in the range of -1 to 0; both scores are in the **Below Average Risk** category. This is well below the median (+2) for sample norms using this instrument. Scores from -3 to -2 are classified as very low risk. Scores from +1 to +3 are classified as average risk. Only scores of +6 and higher are considered to be high risk. Consequently, Mr. Streeter would **not** be considered high risk based on this instrument.

In routine samples of sex offenders that were followed for at least five years after their release and return to the community, individuals like Mr. Streeter, with scores of -1 to 0, were detected to reoffend at a rate of between 1.4% to 3.5%. In other words, roughly 97% to 99% of sex offenders with similar scores were not detected to reoffend upon release to the community during the first five years when the risk of reoffending is at its highest. His relative risk ratio falls in the range of 0.37 to 0.52, indicating that he represents half or less the risk of the average sex offender and falls in a group that is less than 1/10 the risk of "high risk" sex offenders.

While the Static 99-R is useful for a broad comparison with the general class of sex offenders, there is some evidence that child porn offenders may be distinct from the class of sex offenders in general; particularly when there is little or no evidence of actual attempts at hands-on sexual contact with children. This is not a typical child porn case, but to the extent that there is no evidence of actual hands on contact it may be useful to the government and the court to know how Mr. Streeter compares with child porn offenders.

I assessed Mr. Streeter in comparison with specific samples of child porn only offenders using two approaches. One of these is a newer actuarial instrument specific to this population, the Child Pornography Risk Tool (CPORT).[7] This instrument was developed specifically on a sample of child porn offenders (n=266) and involved careful followup data regarding rates of recidivism upon return to the community over the course of an average of 8.3 years. This research identified seven factors that were predictive of recidivism in child porn offenders and that were incorporated in the final actuarial model. Recent research has helped to cross-

---

[7] Seto, M. and Eke, A. Predicting Recidivism Among Adult Male Child Pornography Offenders:
Development of the Child Pornography Offender Risk Tool (CPORT). Law and Human Behavior, 2015, Vol. 39, No. 4, 416–429

- Page 19                                                     December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

---

validate the original findings on an additional sample of 80 men convicted of child porn offenses.[8] The seven factors and the findings related to Mr. Streeter follow:

- Offender age at time of investigation of crimes - Increased risk age 35 and under. Mr. Streeter is 63 at this time. His age is associated with reduced risk. This factor mitigates risk.

- Any prior criminal history - Decreased risk based on no significant criminal record.

- Any prior or index contact sexual offense history - Decreased risk based on no evidence in discovery of contact offending.

- Any prior or index failure on conditional release, such as probation, parole, or conditional release - Decreased risk, based on no criminal record and compliance with pre-trial release (Note: I did consider the allegation that Mr. Streeter had violated his pre-trial release on two occasions, but my understanding is that the court did not in fact find him in violation and the incidents in question did not suggest flagrantly non-compliant behavior).

- Indication of pedophilic or hebephilic interests - The possession of child porn naturally implies a deviant sexual interest in children. Although Mr. Streeter was not charged with possession, he does not deny that he paid for and received sexually explicit material involving the minor female in question. His fetishistic interests in young slender females (whether pre-pubescent or not), defloration, and insemination support the conclusion that he likely has pedophilic or hebephilic interests. This factor aggravates risk.

- Ratio of boy to girl content in child porn - From the discovery and from interview of the defendant I found no evidence of sexual interest in boys. The specific charge and the broader allegations all point to deviant sexual interest in females only. This suggests a ratio of girl > boy content and is therefore considered a risk mitigator.

- Ratio of boy to girl content in nudity and other child content - It is not clear from discovery what if any imagery of minors was found. There is no discovery of electronic, forensic evidence related to this issue. Mr. Streeter's contention is that he found Asian females, particularly Filipino females to be attractive and arousing and likely looked at images, sexually explicit or otherwise, of many females on the site(s) he frequented. This suggests a ratio of girl > boy in other content and is therefore considered a risk mitigator.

---

[8] Eke A, Helmus LM, Seto MC. Sex Abuse. 2019 Jun;31(4):456-476. doi: 10.1177/1079063218762434. Epub 2018 Mar 29. A Validation Study of the Child Pornography Offender Risk Tool (CPORT).

- Page 20                                                    December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

---

Using this actuarial model Mr. Streeter would be assigned a score of +1. Scores on this instrument can range from 0 to +7. A score of +1 is below the mean for child porn offenders (X=1.94, SD=1.57). This supports the conclusion that using an actuarial instrument specific to child porn offenders, Mr. Streeter would be identified as a **low risk**. He does not fall in the high risk range — scores of five or greater — where the predicted rate of recidivism for child porn offenders would be approximately 40%, and the actual rate detected in the normative sample was 47%. In typical cases when recidivism was detected, it primarily involved additional child porn offenses as opposed to hands on offenses. Only 4% of the sample, including high risk offenders, were detected to engage in hands-on sexual recidivism. In other words, to the extent that Mr. Streeter is classified as a child porn offender, when child porn offenders reoffend it is typically through further possession of child porn and not through hands-on sexual offending.   The available evidence supports the conclusion that Mr. Streeter would be more likely to remain offense free than to reoffend sexually. His risk would be approximately ⅕ the risk associated with high risk child porn offenders.

Given that, by his own admission, Mr. Streeter came to possess child pornography, it is logical to be concerned that this is just the tip of the iceberg and that he was also potentially having hands-on sexual contact with minors or motivated to do so. He denied any hands-on contact with minors. He expressed no sexual interest in minors that were accessible to him locally. He denied sexual communication with minors for purposes of seduction, grooming or face-to-face sexual activity. He also denies experimenting with any child grooming behaviors or pursuing activities that might bring him into contact with minors. If further investigation or discovery reveals any allegations of domestic sexual misconduct or grooming, then this would substantially change the opinions I have formulated in this case. If there are no such allegations, and there is no forensic evidence of attempted contact with minors, then Mr. Streeter would be considered more comparable to the majority of contemporary child porn offenders.

Recent research has revealed that — most likely because of the ease of accessibility of child porn in the internet age — child porn offenders are not necessarily actively pursuing hands-on sexual contact with minors. Masturbation, fantasy and self-stimulation based on child pornography may, in many cases, be limited and circumscribed and not involve actions attempting to seduce, coerce or have actual sex with minors. Some of the things from the forensic evidence that might be important in helping to discriminate whether Mr. Streeter was/is at risk for hands on recidivism include:

• Evidence of actual attempts at facilitating sexual activity with a specific minor –
  The facts of this case certainly support the conclusion that Mr. Streeter solicited

- Page 21                                    December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

---

imagery of a person he believed to be a minor engaging in sexual acts. There is no indication that he attempted to arrange to personally engage in sex with the victim. Instead, his sexual exploitation of the victim in this case was virtual. Generally, the facts in this case suggest no physical, sexual contact between Mr. Streeter and either the identified victim or other minors. The absence of attempted hands-on contact mitigates risk.

- Involvement in activities that increase contact with potential victims – Mr. Streeter denied pursuit of activities that might have had the potential to bring him into contact with prospective minor victims, such as fostering or coaching. He was around minors as a parent to his daughter, and as a parent to his young son. He is confident that his own daughter, his daughter's friends or other children that he had actual contact with have never alleged he engaged in any inappropriate behavior. This factor mitigates risk.

- Participating in child pornography communities - Mr. Streeter denies participating in any child porn or pedophile oriented communities, in person or online. Usually, such activity involves forums, chat groups or web sites frequented by like-minded individuals with an interest in sex with children. He denies any history of contributing to collections of child porn and denies creating child porn (other than what was created in response to his solicitation and payment). He denies that he ever shared any of the child porn he received with others and denies trading any of it for access to other child porn. It could be argued that his use of websites linked to Filipino females and his discussions with *"recruiters"* was a form of participation in child pornography communities, but the evidence does not seem to indicate that his activity was exclusively or specifically in relation to a deviant interest in child pornography. In general, his activities appear to have been relatively independent and not in direct affiliation with others who shared a similar deviant interest. This factor is risk neutral to risk mitigating.

- Concurrent or prior sexually dangerous activities – Mr. Streeter does not admit to any historical sexual boundary issues, sexual compulsion, addiction or infidelity. He has not made a habit of engaging in high risk sexual activities, sexual impulsivity, or sexual exploitation of others. He does not appear to be sexually preoccupied or sexually compulsive. His self-reported sexual history consists of consensual, romantic, normophilic sexual activities. This factor mitigates risk.

- Production and distribution of child pornography - Though Mr. Streeter is not alleged to have had any direct physical contact or even communication with the victim in this case, he paid for and solicited the creation of imagery that constitutes child pornography. This factor is a risk aggravating.

- Page 22
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

                                                                    December 31, 2020

---

In summary, structured clinical assessment of risk is congruent with actuarial assessment. Both support the conclusion, based on existing evidence, that Mr. Streeter falls in the **below average to low risk** range with a much greater probability of compliance with sanctions and avoidance of sexual recidivism than high risk offenders.



Note: Percentage may not sum to exactly 100% due to rounding. The average follow-up period after offender release into the community was 102 months (eight years and six months), with a minimum of 24 months.
SOURCE: U.S. Sentencing Commission, 1999-2000 Datafile, USSCFY99-00 and FBI RAP Sheet Special Coding Project.

It is further important to anchor judgments about risk in the context of the relative rate of recidivism in sex offenders versus other classes of criminal offenders in conjunction with consideration of the specific class of child porn offenders. There is a common misconception that sex offenders as a class are a high risk to re-offend. Research has repeatedly shown that sex offenders as a class in fact have the lowest rate of any criminal classification for recidivism and re-conviction.[9]

The most recent studies of sexual recidivism suggest a strong downward trend in the rate of sexual recidivism in convicted sex offenders and suggest a relatively low base-rate of reoffending, around 7% for sex offenders as a whole, and even lower rates among possession-only child porn offenders. There were no major findings on psychosexual examination of Mr. Streeter to suggest that he falls outside this base-rate range.

---

[9] Durose, Matthew R., Alexia D. Cooper, and Howard N. Snyder, Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010 (pdf, 31 pages), Bureau of Justice Statistics Special Report, April 2014

- Page 23
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

December 31, 2020

---

## Summary

The clinical findings in this case reveal that Mr. Streeter is a man of above average intelligence who has led a generally law-abiding lifestyle. He does not have characteristics in common with psychopathic or antisocial sex offenders. He has a history of multiple failed marriages and a particularly dysfunctional relationship with a Peruvian immigrant leading to an extended period in the 2000s when he was effectively a single parent to his young daughter. He explains that as a product of his parenting responsibilities, work responsibilities, and problematic relationship history that he withdrew from dating and courtship from 2005 to 2016. During this time frame he turned exclusively to online sexual communications to achieve sexual gratification and this eventually led, originally without specific intent, to his involvement in procuring sexually explicit material of minor females based in the Philippines. He is adamant that the deviant sexual activity that led to his arrest was circumscribed and did not involve his actual physical, sexual contact with a minor or any effort to do so. More specifically, he admits to conscious awareness of the wrongfulness of such activities; so much so that his feelings of guilt led him to routinely delete illicit material. He describes reactions of guilt and disgust that led to a strong intent to avoid repeating this deviant conduct; an intent that was recurrently overwhelmed by deviant desire. Despite his intentions, he appears to have become so dependent on such material that in 2018-2019, despite being married and the parent of a young child, he could not resist his dependency on such illicit material for sexual stimulation if not gratification.

On clinical examination Mr. Streeter likens his internet pornography use to an addiction. There is growing scientific support for this analogy. In a detailed review of the extant scientific literature, Love et al.,[10] conclude, "The net result of this inquiry yielded a very large number of neuroscience based studies that support the application of the addiction model to addictive Internet related behaviors," including specifically internet based pornography. In particular, the authors describe evidence of neurological and neurotransmitter changes associated with chronic internet pornography use that are remarkably similar to the changes seen in drug addiction. They cite in particular the work of Doidge[11] who summarized the nearly identical neurological impact of pornography and drugs on the brain reward system, stating *"that the continued release of dopamine into the reward system when an individual compulsively and chronically watches Internet pornography stimulates neuroplastic*

---

[10] Love, T., Laier, C., Brand, M., Hatch, L., & Hajela, R. (2015). Neuroscience of Internet Pornography Addiction: A Review and Update. Behavioral sciences (Basel, Switzerland), 5(3), 388–433. https://doi.org/10.3390/bs5030388

[11] Doidge N. The Brain That Changes Itself: Stories of Personal Triumph from the Frontiers of Brain Science. Penguin Books; New York, NY, USA: 2007. [Google Scholar]

*changes that reinforce the experience. Doidge went on to explain how these neuroplastic changes build brain maps for sexual excitement. He introduced an additional component of tolerance, in that previously established brain maps for "natural" sexuality cannot compare to the newly developed and continuously reinforced maps generated by continued compulsive watching of Internet pornography, and thus the addicted individual progresses to more explicit and graphic Internet pornography in order to maintain the higher level of excitement."* Mr. Streeter's spontaneous account of the development of his own pornography addiction is consistent with the clinical course of addictions in general.

As discussed in the body of this report, it is my opinion that Mr. Streeter does suffer from a form of paraphilic disorder. The differential diagnosis would include Pedophilic Disorder and Fetishistic Disorder; with generally greater support for the latter.

Most importantly, there is nothing about the psychological findings specific to Mr. Streeter, or the particulars of this case and the available history, that suggest he is a high-risk sex offender. In fact, to the contrary, both clinical and actuarial assessment of risk places Mr. Streeter in the Below Average to Low Risk range. He is similar in many respects to low risk sex offenders who are generally successful under risk-containment type community supervision; as would be statutorily mandated under federal sentencing guidelines should he be sentenced to community supervision rather than incarceration. This should not be misconstrued as an argument for what sentence is warranted given the crime, but instead is a statement about whether the degree of risk suggests that the defendant could be supervised adequately in the community if this is considered as a part of the eventual disposition by the court.

In this regard, Mr. Streeter appears to be very amenable to supervision and treatment. Recognizing the need for such treatment he has initiated weekly therapeutic counseling with a therapist in the Ft. Lauderdale area specializing in addictive behaviors. He understands that sex offender registration and treatment will be mandatory if and when he is allowed to return to the community. He expresses willingness and motivation to comply fully should he be granted the benefit of community supervision. He is motivated to comply based on concerns about the future of his wife and his three year old son, as well as his 16 year old daughter. He remains gainfully employed and capable financially of contributing to restitution and support of any needed rehabilitation of the identified victim.

Thank you for the opportunity to contribute to this interesting case. Please let me know if you have any additional questions regarding the evaluation of Mr. Streeter.

It is my understanding that the work-product doctrine generally protects the confidentiality of this report unless and until you rely on the report or the opinions herein in your communications with the court or other parties to the case or until you

- Page 25                                                             December 31, 2020
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

---

list me as an expert witness. Please note that if you rely on this report, or the opinions contained herein, or list me as an expert witness in this matter, then this may constitute a waiver of work-product privilege and make this report and the underlying findings subject to further discovery.

Respectfully submitted,

*Michael P. Gamache, Ph.D.*

Michael P. Gamache, Ph.D.
Licensed Psychologist Florida PY0003577

MPG/jm

- Page 26
  Confidential Psychosexual Risk Assessment
  Re: United States v. Christopher Streeter
  8:20-cr-304-T-33CPT
  US District Court, Middle District of Florida

December 31, 2020

Psychological Test Profile: PAI



| Scale | ICN | INF | NIM | PIM | SOM | ANX | ARD | DEP | MAN | PAR | SCZ | BOR | ANT | ALC | DRG | AGG | SUI | STR | NON | RXR | DOM | WRM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Raw | 6 | 1 | 0 | 15 | 14 | 17 | 19 | 24 | 6 | 21 | 9 | 17 | 7 | 9 | 2 | 5 | 1 | 4 | 5 | 9 | 4 | 24 |
| T | 52 | 44 | 44 | 50 | 53 | 51 | 49 | 60 | 32 | 53 | 44 | 49 | 43 | 57 | 42 | 38 | 45 | 46 | 50 | 40 | 44 | 51 |
| % Complete | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

Plotted T scores are based upon a census matched standardization sample of 1,000 normal adults.
■ indicates that the score is more than two standard deviations above the mean for a sample of 1,246 clinical patients.
♦ indicates that the scale has more than 20% missing items.
Skyline represents scores that are two standard deviations above the mean for a sample of 1,246 clinical patients.