UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                          CASE NO. 8:20-cr-304-T-33CPT

CHRISTOPHER JOHN STREETER
a/k/a "JACK REACHER"
a/k/a "JOHN CHRIS"

## UNITED STATES' SENTENCING MEMORANDUM

The United States files this sentencing memorandum requesting that this Court sentence the defendant, Christopher John Streeter, to a guidelines sentence of life imprisonment. In support thereof, the United States submits as follows:

I.        **Background**

For years, Streeter directly participated in a scheme to sexually exploit young children in the Philippines for the purpose of producing sex abuse images and videos for his personal consumption. *See* Doc. 6 at 18–19. From 2018 through June 2019, Streeter repeatedly communicated and transacted with recruiters/facilitators (some of whom identified as minors themselves) for the purpose of recruiting children to engage in sex acts on camera. Doc. 6 at 19–21. The children—some of whom were as young as 12-and-13-years old—were particularly vulnerable due to poverty and illness. Doc. 6 at 19–21. Many of the child victims were immediate family members or classmates of the recruiters. Doc. 6 at 19–21.

Streeter paid for their sexual performances. That money covered recording-production costs, such as hotel rooms, transportation, payment to the persons engaging in sex acts (including the minor), and a commission for the recruiter. Doc. 6 at 19–21. In return, Streeter received videos and images of minors involved in various sex acts that tracked Streeter's

directives, including minors engaged in digital stimulation of their genitals, vaginal intercourse, anal intercourse, and insemination. Doc. 6 at 19–21. Occasionally, Streeter also conversed directly with minors in the Philippines for the purpose of that minor producing pornography of herself. Doc. 6 at 19–21.

Streeter negotiated and paid a premium for videos and images depicting female minors losing their virginity—negotiations that sometimes involved the parent of the minor selling their child's virginity. Doc. 6 at 19–21. He also negotiated and paid a premium for media depicting female minors being inseminated and being placed at risk of pregnancy; a sexual fetish that he enjoyed watching. Doc. 6 at 19–21.

In 2019, Homeland Security Investigations began investigating Streeter based on tips forwarded to the National Center for Missing and Exploited Children. Presentence Investigation Report (PSR), ¶ 21. In March 2020, agents executed a search warrant on Streeter's Land O' Lakes residence. PSR ¶ 34.

On December 18, 2020, Streeter pleaded guilty by plea agreement to an information charging him with sex trafficking of a minor, in violation of 18 U.S.C. § 1591(a) and (b)(1). Docs. 1, 6. Although Streeter's count of conviction relates only to one minor (Victim-1), the investigation revealed that Streeter engaged in the same course of conduct with multiple recruiters/facilitators to victimize an untold number of Philippine minors. Streeter's sentencing hearing is set for January 7, 2021 at 11:15 a.m. Doc. 15.

## II.    Presentence Investigation Report

On December 18, 2020, the U.S. Probation Office issued its Final Presentence Investigation Report. Doc. 29. The Probation Officer determined that Streeter's applicable guidelines range for the underlying offense is life imprisonment, based on an adjusted total-offense level of 43 (adjusted from total-offense level 55 under Chapter 5, Part A cmt. 2) and a

criminal history category of I. PSR ¶¶ 74–77. The applicable period of supervised release is five years to life. PSR ¶ 135.

The parties have no remaining factual or legal objections to the PSR.[1] But Streeter has moved for a downward departure under U.S.S.G. §5K2.0. Doc. 39. This Court should deny Streeter's motion. The United States Sentencing Guidelines expressly prohibit the requested departure. USSG §5K2.0 only allows for downward departures in cases involving child crimes and sexual offenses in extremely limited circumstances. §5K2.0(b). More importantly, §5K2.0 expressly prohibits departures to account for the "defendant's acceptance of responsibility for the offense, which may be taken into account only under §3E1.1." §5K2.0(d)(2). The guideline also counsels against similar departures based on the defendant's decision to plead guilty or enter into a plea agreement. §5K2.0(d)(4). Unsurprisingly, the United States Probation Office does not recommend this departure. PSR ¶ 148. We agree. What is more, as detailed below, the facts and circumstances of this case strongly preponderate against a downward variance.[2] This Court should impose a guidelines sentence.

**III.**    <u>**Argument in support of a guidelines sentence**</u>

Streeter's conduct, taken with the sentencing factors set forth in 18 U.S.C. § 3553(a), calls for a guidelines sentence. Streeter is a prolific consumer and producer of child-sex-abuse content. For years, he exploited disadvantaged children in the Philippines by directing, organizing, and patronizing their sexual abuse for his gratification and entertainment. This Court should impose a guidelines sentence.

---

[1] Mr. Streeter proffered and attempted to cooperate with the United States. The United States plans to detail his efforts at his sentencing. At this time, though, we have no basis to file a substantial assistance motion under USSG §5K1.1.

[2] No aspect of *United States v. Rodriguez*, 64 F.3d 638, 643 (11th Cir. 1995) suggests that this Court should engage in what the guidelines refer to as a "prohibited departure." We plan to respond to Streeter's motion separately.

Although this Court may not presume that a guideline-range sentence is reasonable, the guidelines remain a significant and pivotal component of the sentencing process. *United States v. Delva*, 922 F.3d 1228, 1257 (11th Cir. 2019); *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008) ("[W]hile we do not presume that a sentence falling within the guidelines range is reasonable, we ordinarily expect it to be so."). This Court therefore "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009).

Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Additional factors outlined in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Consideration of these factors necessitates a guidelines sentence.

### A.    Nature and circumstances of the offense

The nature and circumstances of Streeter's offense conduct are horrific. For years, Streeter targeted impoverished children in the Philippines and directly sponsored their sexual abuse to feed his libido. His conduct relating to Victim-1, even taken by itself, weighs heavily in favor of a guidelines sentence.

1.   <u>Streeter actively directed Victim-1's repeated sexual abuse</u>

On multiple occasions throughout 2019, as part of his ongoing scheme to create child

4

pornography for his personal consumption, Streeter financed and directed the production of child sex abuse videos of D.B. ("Victim-1"). Doc. 6 at 20–22. Victim-1 was 12-years old at the time. Doc. 6 at 20–22. Streeter ordered Victim-1 as if she were a product in a catalogue; fist asking for a "pic" to pre-screen her. Doc. 6 at 20. After being told that Victim-1, also referred to by the recruiter as "virgin girl," was under 14-years old, Streeter negotiated prices for depictions of her abuse. Streeter received several videos over the course of a few months depicting Victim-1's sexual abuse.

But Streeter was not a passive consumer of content depicting Victim-1's abuse. Streeter engaged in the trafficking operation and exerted control over the exploitative content's production. For example, he agreed to and paid specific prices for the male abuser, the hotel, the recruiter's commission and for Victim-1's compensation. Doc. 6 at 20. He also disapproved of early versions of the videos, demanding reshoots that showed full vaginal penetration (presumably depicting the loss of Victim-1's virginity) and insemination. Doc. 6 at 22. Streeter appears to have received what he paid for—a later reshoot of Victim-1's sexual abuse depicts the victim crying as blood and semen drip from her vagina. PSR ¶ 23.

    2.  <u>Streeter proposed that Victim-1 be forced to perform a full sex video</u>

During the early negotiations for Victim-1's sex-abuse videos, Streeter and one of his recruiters, L.A., discussed challenges associated with Vitctim-1's participation in a full sex video. The recruiter discussed her intent to avoid the girl's family and clandestinely solicit her participation. Streeter requested assurances that the recruiter had "control" of the girl. Attachment A at 12.

The recruiter explained that Victim-1 was willing to do a "rubbing" video the first time because she was a virgin, and left open the possibility of doing a full sex video at a later date. Attachment A at 13. In response, Streeter appears to have suggested a more forcible solution:

rape. Streeter proposed that the recruiter take her to the hotel under the false pretense of performing in a masturbation video and "just have [the] guy push…take her to hotel, let her think guy will rub but tell guy to fuck her." Attachment A at 14.

### 3. Streeter's impregnation fetish, emergency contraception, and abortions

Streeter's sexual fetishes extended beyond watching depictions of 12 and 13-year-old girls lose their virginities in a sexually violent manner. He also coveted depictions of pubescent female children being inseminated and placed at risk of pregnancy. Doc. 6 at 20. In furtherance of this fetish, Streeter demanded to see semen injected into the victims. He paid increased fees, commissions, and bonus for such videos and sent additional monies for emergency contraception pills. Streeter also expressed a willingness to pay for abortions, if necessary. Doc. 6 at 20.

Victim-1 fell victim to Streeter's abusive impregnation fetish. Doc. 6 at 22. Streeter insisted that she be inseminated and angrily directed that the recruiter force Victim-1 to take emergency contraception. Doc. 6 at 22–23; Attachment B at 2 ("You get the pills for her and make her take them."). The recruiter agreed. Doc. 6 at 22. Streeter's abhorrent behavior in this regard suggests that he views Vitcim-1's moral value and dignity to be so minimal that her sexual health and well-being is secondary to his sexual gratification.

### 4. Streeter likely spoiled evidence and obstructed justice

In the early morning of March 24, 2020, federal agents executed a search warrant on Streeter's residence. He was not home. As a result, Streeter's primary mobile phone—a Verizon Wireless iPhone 11 Pro Max that Streeter had used to send money to his facilitators in the Philippines—was not recovered during the search of his residence. *See* Case No. 8:20-mj-1361-AEP.

6

Days later, on April 5, 2020, agents stopped Streeter at a traffic light and executed a search warrant on his person for his mobile phone. *See* Case No. 8:20-mj-1361-AEP. But the only phone on Streeter's person was an AT&T/Cricket Wireless Samsung phone, which agents seized. Further investigation revealed that the Cricket Wireless account associated with Streeter's phone had been opened under the customer name "Mike Vellar" and activated on Mach 24, 2020—the same day as the search warrant on his residence. *See* Attachment C. Streeter had been a Verizon Wireless customer since December 2013. *See* Case No. 8:20-mj-1361-AEP. Agents never recovered Streeter's iPhone 11 Pro Max.

Streeter's apparent disuse of his iPhone 11 Pro Max and the sudden creation of his Cricket Wireless account—under an apparent alias and on the same day as the search warrant—strongly suggests that Streeter abandoned, concealed, and/or destroyed his iPhone and obtained a new phone, under a new account, in order to spoil evidence and obstruct the investigation into his conduct. This investigation and the resulting prosecution has therefore been limited by an inability to analyze Streeter's most personal electronic footprint—his primary mobile phone. In any event, the information that is available and presented herein weighs heavily in favor of a guidelines sentence.

5.   Streeter's offense conduct warrants a guidelines sentence

The seriousness and duration of Streeter's offense conduct demonstrate the necessity of a guidelines sentence. Streeter did not suffer from a solitary lapse in judgment. His conduct was calculated and premeditated. For years and on multiple occasions, Streeter deliberately and consistently elected to sponsor, patronize, and direct the sex trafficking of impoverished children from a poor nation.

The Eleventh Circuit has consistently upheld life and natural-life sentences for overseas conduct by United States citizens reaching similar levels of depravity. For example, in *United*

*States v. Irey*, the Eleventh Circuit, sitting en banc, overturned a 17.5-year sentence and essentially imposed the statutory maximum punishment for a middle-aged defendant who had traveled abroad and had recorded himself sexually abusing multiple children. 612 F.3d 1160, 1225 (11th Cir. 2010). Much like Streeter, Irey scripted, casted, and produced video series depicting child sex abuse. *Cf. Irey*, 612 F.3d at 1166. In *United States v. Kapordelis*, the Eleventh Circuit upheld a 35-year sentence resulting from an upward variance where the defendant traveled internationally to sexually abuse minors, produced pornographic content of the encounters, and transported that content into the United States. 569 F.3d 1291, 1319 (11th Cir. 2009).

The Eleventh Circuit has also consistently affirmed as reasonable life and natural life sentences for persons involved in organizing and facilitating the sex trafficking of minors and other persons. For example, in *United States v. Mozie*, the Eleventh Circuit upheld as substantively reasonable a life sentence for a defendant convicted of sex trafficking minors (13-years old and 17-years old) and child-pornography production in connection with his running an underground brothel. 752 F.3d 1271, 1289 (11th Cir. 2014). In another example, *United States v. Flanders*, the Eleventh Circuit affirmed as reasonable two life sentences where defendants lured women to South Florida under false pretense, drugged them, filmed them having sex, and distributed the footage over the internet. 752 F.3d 1317, 1341 (11th Cir. 2014). The *Flanders* decision emphasized that while neither defendant had significant criminal history, their scheme, much like Streeter's, went on for years and involved a large number of victims. Additional illustrations abound. *See, e.g., United States v. Cortes-Meza*, 685 F. App'x 731, 733 (11th Cir. 2017) (upholding 40-year sentence where defendant was convicted of trafficking women from Mexico for prostitution in Atlanta, rejecting argument that sentence was unreasonable because it was a "*de facto* life sentence."); *United States v. Madkins*, 390 F. App'x

8

849, 852 (11th Cir. 2010) (upholding 50-year sentence for individual who knowingly trafficked minors from Virginia to Florida so that they could engage in prostitution).

This Circuit has likewise upheld stern sentences for schemes aimed at advertising and producing child pornography, as well as the attendant hands-on sexual abuse of children. For example, in *United States v. McGarity*, the Eleventh Circuit upheld life sentences for each defendant involved in running a large, multinational child pornography ring. 669 F.3d 1218, 1264 (11th Cir. 2012). Additionally, in *United States v. Sarras*, the Eleventh Circuit affirmed as substantively reasonable a 100-year sentence where the defendant had several sexual encounters with a single 13-year-old girl for roughly one year and took explicit photographs of her. *See* 575 F.3d 1191, 1220 (11th Cir. 2009). And, in *United States v. Johnson*, the Eleventh Circuit upheld as reasonable a 140-year sentence where the defendant, with a criminal history category of I, abused and photographed three boys—Victim 1, from 8–15 years old, Victim 2, from 14–16 years old, and Victim 3, from 13–14 years old. *See* 451 F.3d 1239, 1244 (11th Cir. 2006); *see also United States v. Kapordelis*, 569 F.3d 1291, 1318–19 (11th Cir. 2009) (upholding as reasonable a 420-month sentence, which represented an upward variance, where defendant engaged in a pattern over many years of molesting young teenaged boys and taking photographs of them); *United States v. Rothenberg*, 610 F.3d 621, 625–27 (11th Cir. 2010) (rejecting a challenge to 300-month sentence for a 64-year-old defendant who engaged for sex an undercover agent posing as the father of an eleven-year-old daughter); *United States v Manley*, 231 F. App'x 870, 871 (11th Cir. 2007) (rejecting reasonableness challenge to 360-month sentence for a 64-year-old defendant who took to the internet to engage an undercover agent offering up her putative 12-year-old son and daughter for sex).

Indeed, in most cases, the Eleventh Circuit has "treated sex offenses as serious crimes, upholding severe sentences…" *United States v. Pugh*, 515 F.3d 1179, 1202 (11th Cir. 2008). The

Eleventh Circuit is not alone in that regard. *See, e.g.*, *United States v. Raplinger*, 555 F.3d 687, 689–695 (8th Cir. 2009) (upholding as reasonable a 457-month sentence where the 34-year-old defendant enticed a 15-year-old victim into a long-term sexual and romantic relationship, produced child pornographic photos of her, and introduced her to other adults who had sexual contact with her); *United States v. Betcher*, 534 F.3d 820, 827-28 (8th Cir. 2008) (upholding as reasonable a 750-year sentence for a first-time offender, offense-level 52, who had taken pornographic pictures of five 8 to 11-year-old girls, including two of his granddaughters).

Although this Court must consider other factors beyond Streeter's offense conduct, this Court should nonetheless give significant weight to his offense conduct in crafting his sentence. *See, e.g.*, *United States v. Croteau*, 819 F.3d 1293, 1309 (11th Cir. 2016) ("The weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court."). By patronizing and financing the enterprise that trafficked Victim-1, Streeter has likely caused a lifetime of emotional damage for her. Indeed, Streeter controlled and commanded the minute details of Vitcim-1's dehumanizing abuse. And, as detailed below, Streeter's systemic conduct fueled the degradation of an untold number of victims in a similar manner; victims who no doubt suffered the same physical and emotional toll as Victim-1. A guidelines sentence is therefore a just sentence in this case.

### B.   History and characteristics of the defendant

Streeter's history and characteristics also weigh strongly in favor of guidelines sentence. Streeter is a deviant child predator who for years orchestrated a campaign to inflict sexual violence upon an untold number of young children in Southeast Asia. Although the full scope of Streeter's conduct is unknown; it likely carried on for years, involved multiple recruiters, and victimized countless children. Our forensic window into Streeter's conduct is limited to two fake Facebook profiles, which Streeter used to communicate with recruiters sourcing his

10

victims in the Philippines. The returns from those profiles alone included 9,000 pages of messages, ranging from October 2018 through August 2019. Resource constraints have prevented the United States from fully analyzing those chats—agents were only able to analyze 1,000 of the 9,000 pages. But upon review of those 1,000 pages, agents identified approximately 11 additional child victims and at least 20 possible victims of an unknown age. Some of Streeter's exchanges involving the additional minor victims are detailed below.[3]

1.  Streeter likely engaged in the offense conduct for many years

Streeter primarily utilized fake, pop-up Facebook accounts to communicate with individuals sourcing children for Streeter's sex-abuse productions. The two Facebook accounts that agents searched employed the usernames "Jack Reacher" and "John Chris." PSR ¶ 39. As explained above, messages within those accounts show Streeter's conduct stretching back as far as October 2018. Doc. 6 at 20. But Streeter's financial transactions on Western Union, MoneyGram, Xoom, and Remitly paint a far more frightening picture. For example, Western Union records beginning on October 22, 2009 and continuing into 2015 show Streeter sending money to various persons in Ozamis City—the same city where Victim-1 and Victim-2 live. Attachment D. These transactions occurred with the same pattern, amounts and frequency as the payments that Streeter has admitted were sent to child recruiters for the purpose of creating child pornography. *Compare* Attachment D *with* Doc. 6 at 19–22. Over the course of a decade, across all known platforms, Streeter sent roughly $130,000 to the Philippines, mostly through small transactions that match the prices he paid for the sex-abuse content of Victim-1 and other minor victims.[4]

---

[3] We also attach a broader, summary exhibit of the 1,000 page review. Attachment E.

[4] Not all of these transactions were criminal in nature. Some transactions represent Streeter remitting money to his current wife. Moreover, some transactions likely represent payment for adult

2.   Additional identified and unidentified victims

a.   Identified victim E.P ("Victim-2")

In April 2019 and June 2019, Streeter negotiated prices with L.A.—the same recruiter who sourced Victim-1—for videos depicting sex abuse of a 12-year-old Philippine girl, E.P ("Victim-2").[5] During the negotiations, Streeter stated: "It's time for [E.P.] to feel the white fill her pussy." Attachment F. The recruiter responded: "I will ask her mother too." Streeter inquired, "[w]ill mother agree," to which the recruiter responded: "Yes if have money hon she will…They poor." Attachment F.

In response to the recruiter stating that E.P was stubborn, Streeter replied: "Maybe her mother will help convince her." Attachment F. Streeter then made specific requests for the type of sexual intercourse and sexual positions he wanted in the videos: "Make sure guy puts white in pussy after fucking her butt…Have guy push her legs apart while pushing cock into butt…Then fuck her from behind in pussy too." Attachment F.  The recruiter eventually sent Streeter multiple child-pornographic videos depicting Victim-2, as requested, in exchange for the negotiated payments. But Streeter was not satisfied with those videos, either, commenting: "Why is there no blood, guys cock went in way too easy and girl made no noise when it should have hurt a lot." Attachment G.

b.   Unidentified victim "14-year-old girl, a/k/a 'that girl'"

In December 2018, Streeter discussed creating sex abuse videos of yet another minor, an unnamed 14-year-old girl. The recruiter sent Streeter several pictures of the victim.

---

pornography. But the transactions nonetheless appear to match the pattern associated with the illicit conduct in this case.

[5] In September 2020, Philippine authorities arrested L.A. and rescued Victim-1 and Victim-2. The other recruiters and facilitators referenced in this memorandum appear to still be at large. The additional victims have not been identified.

Questioning the victim's purported age, Streeter stated: "I need one pussy pic that should tell me if she is [14]." Attachment H at 7. Streeter eventually agreed to purchasing a sex abuse video of the 14-year-old girl, adding: [a]s long as he fuck her good so I hear her moan as he breaks her I am ok with 900 [pesos]." Attachment H at 7. Streeter remitted payment and provided a transaction number.

c. *Unidentified victim "Friend of Virgin"*

In June 2019, Streeter negotiated and paid for a sex-abuse video of an unknown 15-year old girl referred to as "friend of virgin." Streeter sent 4,500 Philippine pesos with specific instructions: "[d]on't let his balls block you getting video of her pussy with cock driving deep." Attachment W.

d. *Unidentified victim ("M.G.")*

In July 2019, Streeter communicated directly with an unidentified 16-year-old Philippine girl who used the moniker M.G. Streeter offered the minor money for naked pictures and larger sums for videos of her having sex with a male. Streeter instructed that the videos depict M.G.'s insemination. Attachment X.

e. *Unidentified victim ("M.V.")*

Streeter also communicated with an unidentified victim who used the Facebook display name M.V. M.V. identified herself as a 15-year-old female. Based on conversations with M.V., Streeter appears to have paid for a video of M.V. losing her virginity on a prior occasion. Attachment Y; Attachment Y-1. In 2019, Streeter negotiated and paid M.V. money in exchange for additional sexually explicit content, which she recorded and sent. Attachment Y; Attachment Y-1. Streeter also stated: "I think you're the girl that I'm going to end up paying it to get pregnant…I would give you a bonus if you got pregnant but after that you're going to have a baby…[o]r you can use the bonus and have an abortion." Attachment Y-1. After some

13

discussion about abortion costs, Streeter stated: "We'll let's see what happens after you do a video with no pills…OK so maybe I will have you make videos till you're pregnant...second fuck is white into your fertile pussy…[w]e will get you abortion." Attachment Y.

### f.   Unidentified victim ("Sherin")

In November 2018, Streeter ordered a sex video of an unidentified girl referred to as "Sherin." The recruiter informed Streeter that the victim was either 16 or 17-years old. Streeter was hesitant to send a large sum of money for the video, noting that he didn't "want to attract attention." He ultimately paid 5028 Philippine pesos—an amount he claimed would not attract attention. But Streeter was not satisfied with the video he received, noting: "[t]here was no blood…[t]here is no video of guy pushing white or of when his cock break her why is this missed, it most important part of video. This video was a disaster." Attachment Z.

### 3.   Sexual violence and young children

In addition to Streeter's insatiable appetite for new content and his pregnancy fetish, Streeter also appeared to prefer sexually-violent content. Streeter consistently requested videos female's vaginas being "broken." He also inquired about the victims' off-camera reactions, including whether they suffered, cried, or were in pain. *E.g.*, Attachment I ("[d]id she cry out when cock break her…[d]id it hurt her pussy when cock break her."). Streeter also expressed disappointment if the videos did not depict suffering. *E.g.*, Attachment J ("Why is there no blood, guys cock went in way too easy and girl made no noise when it should have hurt a lot."); Attachment L ("reason I want guy to finger her was to make her cry out but she made no noise); Attachment M ("I want to hear her cry to and see her face when guy push fingers deep."); Attachment O. At one point, Streeter even gave advice on how to muffle the agony of a victim while still leaving a vantage point for him to observe her suffering. Attachment N ("…best way to do this I think is to tell the guy to fuck the girl like she is not a virgin…[i]f you

think they will cry give them a towel to put over their mouths to muffle their voice, but I want to be able to hear and see their face when guy is pushing.").

Streeter also consistently pressured his recruiters to find new children and younger children to abuse in this manner. Attachment Q at 3 ("Maybe what we will do is the new girl tomorrow with big white then I want the virgin girl again with big white and then [Victim-2] the day after her birthday."); Attachment R (recruiter sending picture of victim); Attachment P ("Keep asking if one of these girls has a younger sister…that would like to make money."); Attachment K at 13 ("We will do another no pills video this week with your school uniform."). His facilitators' responses suggest that they were well-aware of his preferences in that regard. Attachment T ("[f]or now I don't have girls who is under 14 below but I will try to find for you."); Attachment U ("O forgot that your [sic] looking for 14 years old hon I suddenly remember now that im watching cartoons."). Indeed, Streeter exerted unquestionable control over the recruiter's conduct, even creating a set of norms and rules to follow. Attachment P-1 (reprimanding recruiter for "breaking [his] rules again" by making advanced payment); Attachment S at 4 ("DO NOT ASK ME FOR MONEY FOR YOUR BABY, you lost that opportunity.").

4.   Streeter's personal history does not support a downward departure or variance

The United States agrees with the U.S. Probation Office that Streeter's history and characteristics do not warrant a downward departure or downward variance. *See* PSR ¶¶ 148–49. Nothing in Streeter's background supports a downward variance from a guideline sentence. If anything, Streeter's history and characteristics reveal aggravating factors.

Streeter is not a defendant with a lower IQ or other mental, emotional, or social disabilities. Despite the depravity of his offense conduct, Streeter has no history of mental illness or emotional problems besides claustrophobia. PSR ¶¶ 114–116. Streeter is an extremely

15

intelligent and well-educated person. He graduated high school at the unusually young age of 15. PSR ¶ 120. He holds a bachelor's degree in marine engineering from New Zealand Maritime Academy. PSR ¶ 121. Streeter also pursued higher-education, holding a mate's license he obtained in New Zealand and a master's license from the United States Coast Guard. PSR ¶ 123. Streeter's education and intelligence translated into financial success, as he owns and manages a successful yacht-refurbishment company in Fort Lauderdale. PSR ¶ 124. Moreover, the PSR does not reveal anything remarkable about his childhood or life that could explain his offense conduct. Although Streeter claimed that his father was a harsh disciplinarian, there is no indication of substance abuse, sexual abuse, or serious physical abuse in his childhood home. PSR ¶¶ 86–106.

Streeter's age, wisdom and life experience render his offense conduct more egregious than, for example, an untraveled college student using Facebook to do the same from a dormitory. Streeter is well-traveled and has spent time in the Philippines, where he met his wife. PSR ¶ 102. He was no doubt aware of that nation's ailments and the poverty cycle that plagues its vulnerable citizens and their children. PSR ¶¶ 96, 102. Streeter is also the father of a daughter who was the same age as Streeter's victims during his offense conduct. PSR ¶ 99.

Finally, Streeter's fairly advanced age of 63 does not, on balance, weigh in favor of a downward departure or variance. Although Streeter's age is something this Court can and must consider, it is merely one aspect of Streeter's personal characteristics, which are, more broadly, one of many sentencing factors under section 3553(a). This Court should not turn a blind eye toward the rest of the sentencing factors discussed throughout this memorandum and reward Streeter with a large downward variance merely because a guidelines sentence would likely result in him never being released from prison. *See Pugh*, 515 F.3d at 1192 (underscoring that unjustified reliance on a single factor may result in an unreasonable sentence if the court

relied on impermissible factors or ignored other relevant § 3553(a) factors). Advanced age does not immunize defendants from a just sentence. Streeter's personal history and characteristics ultimately do not weigh in favor of a downward departure or variance.

### C. Adequate deterrence and the need to protect the public

Deterrence is important for crimes involving the sexual abuse of children, including child pornography. *See United States v. Goldberg*, 491 F.3d 668 (7th Cir. 2007). "Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor." *See id.*

The Supreme Court has noted "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class..." *Smith v. Doe*, 538 U.S. 84, 103 (2003). Streeter fits well within that class. As this Circuit recognized in *Irey*, research in this field is "consistent with what judicial decisions show: pedophiles who have sexually abused children are a threat to continue doing so, and age does not remove the threat." 612 F.3d at 1214 (citing various studies and reports); *see also Pugh*, 515 F.3d at 1201 ("sex offenders have appalling rates of recidivism and their crimes are under-reported."); *United States v. Allison*, 447 F.3d 402, 405–06 (5th Cir. 2006) ("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders."). Streeter's pattern of sexual exploitation of impoverished children from a disadvantaged nation evidences a high probability of recidivism if this Court allows him the chance to reenter society. A strong need thus exists to protect children from Streeter—now and well into the future.

Streeter's interest in repeatedly watching young girls be sexually abused—some in a violent manner—strongly supports the proposition that he poses a danger to the community and children everywhere. Although the United States did not uncover evidence of Streeter having directly abused children, his willingness to enlist and finance agents to source and abuse

17

minors—especially prepubescent and pubescent minors—for his consumption nonetheless suggests that he poses a danger to children everywhere. Moreover, Streeter's proven aptitude to inflict such harms from behind a computer screen means that he poses that danger from inside his home; regardless of his age, physical condition, and ambulatory capabilities.

What is more, Streeter's deviant fetishes, such as watching young women painfully lose their virginities, become inseminated, and be placed at risk of pregnancy, pose an added danger to children in the community and elsewhere. His willingness to direct and pay for emergency contraception and abortions for barely pubescent children suggests a mind deviant enough to inflict enormous harm. Streeter's conduct strongly implies that he views his own sexual gratification as paramount to the reproductive health and wellbeing of vulnerable children.

Beyond protecting the community from Streeter's uncontrollable lust for child-sex-abuse content, this Court should also impose a guidelines sentence to send a strong warning to other individuals currently involved in or considering similar conduct. Sex trafficking and cyber-sex trafficking are a serious scourge in the Philippines and across Southeast Asia. Attachment V. Participants such as Streeter help create that market and drive demand. A guidelines sentence signals to anyone inclined to leverage economic power to exploit vulnerable, impoverished children overseas that such behavior is abhorrent and will be harshly punished.

### D. Seriousness of the Crime, Promoting Respect for the Law, and the Need for Just Punishment and to Avoid Unwarranted Sentencing Disparities

"Retribution is a valid penological goal." *Glossip v. Gross*, 135 S. Ct. 2726, 2769 (2015) (Scalia, J. concurring). As the Eleventh Circuit explained in *Irey*: "the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime." 612 F.3d at 1206. Punishment is the way in which society expresses denunciation of wrongdoing, and it is thus essential that this Court promote and maintain respect for the law by pronouncing sentences that fully reflect society's revulsion. *See Gregg v. Georgia*, 428 U.S.

153, 184 n. 30 (1976) (citing Royal Commission on Capital Punishment, Minutes of Evidence, Dec. 1, 1949, p. 207 (1950)). "Child sex crimes are among the most egregious and despicable of societal and criminal offenses…" *Sarras*, 575 F.3d at 1220 (discussing how courts have upheld lengthy sentences in cases involving child sex crimes as substantively reasonable). Here, the seriousness of the crime, taken with the need for just punishment, the need to avoid unwarranted sentencing disparities, and the goal of promoting respect for the law, weigh heavily in favor of a guidelines sentence.

    1.  <u>Promoting respect for the law</u>

This Court's sentence must reflect the need to "promote respect for the law." 18 U.S.C. § 3353(a)(2)(A). When Congress passed the Protection of Children against Sexual Exploitation Act of 1977, it sought to address the organized, nationwide child pornography industry that was generating millions of dollars through the exploitation of children. S. REP. 95-438, 5, 1978 U.S.C.C.A.N. 40, 42-43. The Act aimed to fill a void in federal law by targeting the production of materials depicting child abuse. S. REP. 95-438, 5, 1978 U.S.C.C.A.N. at 56. Analogously, when Congress passed the Telecommunications Act of 1996, it amended 18 U.S.C. § 2422 to prohibit individuals from using the newly-available internet to entice minors into prostitution or other sex-based crimes. PL 104–104, February 8, 1996, 110 Stat 56. In the same vein, by passing and consistently amending 18 U.S.C. §§ 1591 (sex trafficking of children) and 2423 (transportation of minors), Congress has made clear that "child pornography producers are human traffickers." Justice for Victims of Trafficking Act of 2015, PL 114-22, May 29, 2015, 129 Stat 227.

But the legislative framework that Congress created represents more than a series of prophylactic measures. The statutes reflect value judgments and moral norms of our society. Child sex abuse "is grossly intrusive in the lives of children and is harmful to their normal

psychological, emotional and sexual development in ways which no just or humane society can tolerate." *See Kennedy v. Louisiana*, 554 U.S. 407, 468 (2008) ((Alito J., joined by Roberts, C.J., Scalia, and Thomas, JJ., dissenting) (citation omitted). Streeter's depraved conduct transgresses every moral norm imbedded in the statute that he violated. His multi-year campaign to facilitate child-sex trafficking thus does enormous violence to the perception of the United States, its laws, and its citizenry; both here and abroad.

Moreover, Streeter's repeated conduct shows that he has no respect for the law. Indeed, his conduct and sense of entitlement suggest that he believes he is above the law. This Court's sentence must express an appropriate level of social condemnation of his crimes, as well as restore public confidence in our laws. Only a guidelines sentence achieves those ends.

2.  Need to avoid unwarranted sentencing disparities

This Court should not discount Streeter's conduct because he acted through agents to inflict hands-on abuse, as opposed to physically inflicting the abuse himself. Streeter's use of agents served as a force multiplier that likely magnified the harm he was able to cause. Nor should this Court weigh his conduct lightly because the sexual abuse occurred overseas, as opposed to inside the United States. The children who Streeter victimized are of equal moral worth to children in the United States and to those in our immediate community.

In this sense, this Court's sentence should be informed by sentences imposed upon defendants who similarly engaged in long campaigns of child-sex abuse and child-pornography production in our community. For example, in 2018 this Court sentenced William Napolitano to life imprisonment for enticing a particularly vulnerable 15-year-old child, recording and distributing sex acts of the child, and amassing a deviant child pornography collection. *United States v. Napolitano*, Case No. 8:17-cr-573-T-33AAS, Docs. 71, 75. Like Streeter, Napolitano

20

harbored an intense sexual interest in young teen and pre-teen children and enjoyed consuming depictions of their abuse. *See* Doc. 71.

Napolitano, who pleaded guilty and attempted to cooperate, had also conspired to abuse minors in the community with local Assistant Principle, Kyle Ritsema. Doc. 71. In 2019, Ritsema, who also pleaded guilty, was sentenced to 35 years' imprisonment for sexually abusing multiple minors in the community and producing depictions of that abuse. *United States v. Ritsema*, Case No. 8:18-cr-68-T-35TGW, Docs 79, 92.

This Court has also sentenced Richmond McDonald to life imprisonment for his role in sexually abusing a seven-year-old child offered up by her deviant relative and for recording that abuse. *United States v McDonald*, Case No. 8:16-cr-517-T-33AEP, Doc. 164. Finally, another defendant in this Court, Edwin Santiago, recently received a 41-year sentence after pleading guilty to attempting to produce child pornography of his eight-year-old relative and discussing the sale of her virginity with individuals on the internet. *United States v. Santiago*, Case No. 8:18-cr-351-36AEP, Docs. 85, 91. The sale of Santiago's relative's virginity never materialized, much unlike Streeter's case; where virgins as young as 12-years old were recruited and paid to lose their virginity, be inseminated on camera, and suffer other extreme forms of sexual abuse as dictated by Streeter.

3.  Impact on the victims

It is axiomatic that hands-on sexual abuse inflicts upon its victims enormous, devastating, and long-lasting harm. That the abuse is inflicted on a child adds a devastating dimension to the harm ordinarily inflicted on rape victims. As the Supreme Court explained while addressing an Eight Amendment challenge to capital punishment for the rape of a child by her stepfather in *Kennedy v. Louisiana*:

> […] the victim's fright, the sense of betrayal, and the nature of her injuries caused more prolonged physical and mental suffering than, say, a sudden killing by an unseen

> assassin. The attack was not just on her but on her childhood.... Rape has a permanent psychological, emotional, and sometimes physical impact on the child. We cannot dismiss the years of long anguish that must be endured by the victim of child rape.

554 U.S. at 435 (citing various studies). Those years of anguish can include

sudden school failure, unprovoked crying, dissociation, depression, insomnia, sleep

disturbances, nightmares, feelings of guilt and inferiority, and self-destructive behavior,

including an increased incidence of suicide. *Id.* at 468 (Alito J., joined by Roberts, C.J., Scalia,

and Thomas, JJ., dissenting). Sexually exploited children also struggle to develop healthy

affectionate relationships, they suffer from sexual dysfunctions, and they have a tendency to

become sexual abusers themselves. *New York v. Ferber*, 458 U.S. 747, 758 n. 9 (1982) (citation

omitted).

The sexual abuse sponsored and directed by Streeter is egregious and has likely inflicted

irreparable harm on scores of children across the Philippines. Indeed, the physical harm

suffered by Victim-1 and Victim-2 is apparent from the videos and messages alone.

Streeter prayed on the emotional and economic vulnerabilities of children from

particularly impoverished areas of a generally poor nation. His victims will likely be in need of

therapeutic treatment as they mature and learn to develop appropriate and healthy

relationships—treatment they may never gain access to. They will also have to live their lives

knowing that videos of their sexual abuse—in some cases depictions of them losing their

virginities—have been sold and distributed an unknown number of times across the internet.[6]

As the Supreme Court has recognized, "[t]he distribution of photographs and films depicting

sexual activity by juveniles is intrinsically related to the sexual abuse of children....[T]he

---

[6] Although we have no evidence that Streeter shared the videos he ordered with third parties, the course of dealings suggest that the recruiters would often resell old videos. At times, they even attempted to repackage old videos to Streeter that he had already paid for and consumed (much to his disappointment). It would therefore defy reason to suggest that the videos created at the Streeter's behest have not circulated to other consumers.

materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation..." *Ferber*, 458 U.S. at 758–59 nn. 9–10 (citations omitted).

A guidelines sentence is necessary to recognize the victims (both identified and unidentified) harmed by Streeter's conduct and to restore public confidence in our laws protecting children.

**IV.**     **Conclusion**

This Court should sentence Streeter to a guidelines sentence. Nothing in the offense conduct or Streeter's history and characteristics warrants a downward departure or variance. A guidelines sentence is the only reasonable sentence because it is the only sentence that reflects the seriousness of Streeter's crimes, provides just punishment for those crimes, fully protects children, and promotes respect for the law.

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

By:     */s/ Francis D. Murray*
Francis D. Murray
Assistant United States Attorney
Florida Bar No. 0108567
400 N. Tampa Street, Ste. 3200
Tampa, FL 33602
Phone:  (813) 274-6000
Fax:    (813) 274-6103
Email: francis.murray2@usdoj.gov

**U.S. v. Streeter**                                    **Case No. 8:20-cr-304-T-33CPT**

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2021, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which

will send a notice of electronic filing to the following:

Mark P. Rankin, Esq.

*/s/ Francis D. Murray*
Francis D. Murray
Assistant United States Attorney
Florida Bar No. 0108567
400 N. Tampa Street, Ste. 3200
Tampa, FL 33602
Phone:  (813) 274-6000
Fax:    (813) 274-6103
Email: francis.murray2@usdoj.gov

24